Henry A. CANFIELD, Appellant,

v.

FOXWORTH–GALBRAITH LUMBER COMPANY et al., Appellees.

No. 974.

Court of Civil Appeals of Texas, Tyler.

Dec. 30, 1976.

Rehearing Denied Jan. 27, 1977.

Robert Harms Bliss, Dallas, for appellant.

M. Robert Blakeney, Seay, Gwinn, Crawford, Mebus & Blakeney, Dallas, for appellees.

McKAY, Justice.

Appellant, Henry A. Canfield (Canfield) brought this suit for damages against Foxworth-Galbraith Lumber Company (Foxworth) and Kenneth D. Adams (Adams) alleging that in the sale of a house and lot in Farmers Branch under a second lien deed of trust foreclosure Adams, as Trustee, refused to apply the proceeds of the sale in accordance with the terms of the deed of trust. Canfield alleged he was entitled to any overage after payment of the second lien by notice of quitclaim deed and assignment from Benny C. Clark and wife, Betty Lou Clark, against whom the foreclosure was made. Foxworth and Adams denied Canfield had any claim against them and alleged that Adams had accounted to the Clarks for any and all interest they may have had, and that the Clarks consented to the payment of the first lien by Adams and waived any further claim. Trial was before a jury and judgment was rendered on the verdict that Canfield take nothing. Canfield's motion for judgment non obstante veredicto was overruled, and he brings this appeal.

Foxworth was beneficiary under a deed of trust dated February 9, 1966, securing indebtedness from the Clarks in the original amount of $1,250, such indebtedness being evidenced by a promissory note of the same date and the lien covering a lot in Farmers Branch. On November 6, 1973, the total amount due Foxworth by the Clarks was $566.88, including principal and interest. The first lien on the lot was held by Bankers Life and Casualty Company, and on November 6, 1973, the amount owed on such first lien was $11,444.95.

The Clarks were in default to Foxworth on its second lien note and, after posting notices, Adams sold on November 6, 1973, at trustee's sale, the property in question to Foxworth on its bid of $15,000, with Foxworth conditioning such bid on receiving a general warranty deed with fee simple title, free and clear of all incumbrances. Foxworth paid $14,433.12 to Adams at the sale, which amount represented the difference between Clarks' debt to Foxworth and Foxworth's bid. On the day of the sale Adams mailed a check to Bankers Life and Casualty in the amount of $11,444.95 which paid the first lien mortgage, and the remaining balance of $2,988.17 was mailed to the Clarks on November 12, 1973. The trustee's deed from Adams to Foxworth, dated November 13, 1973, contained a general warranty of title by Adams for and in behalf of the Clarks.

Canfield attended the sale but did not contact any representative of Foxworth, or trustee Adams. He then sought out the Clarks, found them in Tyler, and obtained a quitclaim deed from them for $100.00 which he filed in the Dallas County Deed Records on November 12, 1973. On November 19,

1973, Canfield demanded from Adams by letter and orally by phone the $14,000 overage from the trustee's sale. On December 1, 1973, on the advice of a lawyer, Canfield obtained from the Clarks an informal instrument purporting to "assign any and all overage" emanating from the Clarks' deed of trust foreclosure sale "save and except any monies already received by us as a result of the foreclosure of the above property." Prior to the execution of the "assignment" the Clarks had received the payment from Adams of $2,988.17.

In response to the issues submitted[1] the jury found that Clark consented to the payment by Adams, the trustee, of $11,444.95 to Bankers Life and Casualty Company from the proceeds of the foreclosure sale; that Adams intended to pay the outstanding first lien indebtedness so that he could convey a fee simple title to the purchaser at the trustee's sale; and that Foxworth intentionally included in its bid an amount sufficient to pay the first lien indebtedness. The record reveals that there were no requests for jury issues from Canfield.

Canfield brings one point of error with four subdivisions. He maintains in his point that the trial court erred in not granting his motion for judgment non obstante veredicto. By his first subpoint Canfield contends that an instructed verdict would have been proper because it was undisputed that the trustee failed to disburse the sale proceeds according to the terms of the deed of trust. We believe this subpoint is without merit.

The language of the deed of trust directing the trustee to sell the property and dispose of the proceeds of the sale reads as follows:

"The said Trustees, or any substitute Trustee, is hereby authorized and empowered, and it shall be his special duty at the request of the above named payee . . . to sell the above described property . . . and after such sale to make the purchaser or purchasers hereunder good and sufficient deeds with general warranty of title in the name of the undersigned herein, binding as well the latter's heirs, executors, administrators and assigns, and conveying the property so sold to the purchaser in fee simple, and to receive the proceeds of said sale and dispose of same in the following manner:

"First, by paying all the expenses of advertising, sale and conveyance, including a five per cent commission to the Trustees acting, computed on the sale price; and Second, by paying to the holder or holders of the indebtedness herein secured the full amount of principal and interest, and attorney's fees, if any, due and unpaid on such indebtedness, and Third, by rendering the balance, if any, of such proceeds to the undersigned, or to the latter's heirs or assigns; and such sale shall forever be a perpetual bar

1. "SPECIAL ISSUE NO. 1.

"Do you find from a preponderance of the evidence that Mr. Benny C. Clark consented to the payment by the Trustee from the proceeds of the foreclosure sale of the first lien indebtedness in the amount of $11,444.95 to Bankers Life and Casualty Company?

" 'CONSENT,' as that term is used in this special issue, means a concurrence of wills; voluntarily yielding the will to the proposition of another; acquiesence or compliance therewith; the act or result of coming into harmony or accord.

"Answer 'YES' or 'NO.'
"ANSWER 'Yes.'
"SPECIAL ISSUE NO. 2.
"Do you find from a preponderance of the evidence that the Defendant, Kenneth D. Adams, in paying off the first lien to Bankers Life and Casualty Company from the proceeds of the foreclosure sale he conducted on November 6, 1973, intended to pay the outstanding first lien indebtedness on the real property in question in order that he could convey a fee simple title to the purchaser at the trustee sale in accordance with the deed of trust under which he was trustee?

"Answer 'YES' or 'NO'.
"ANSWER 'Yes.'
"SPECIAL ISSUE NO. 3.
"Do you find from a preponderance of the evidence that Foxworth-Galbraith Lumber Company intentionally included in their bid at the foreclosure sale an amount sufficient to pay off the first lien indebtendess on the property to Bankers Life and Casualty Company?

"Answer 'YES' or 'NO.'
"ANSWER 'Yes.' "

against the undersigned and the latter's heirs and assigns, and all other persons claiming under any of them."

As pointed out in *Slaughter v. Qualls*, 139 Tex. 340, 162 S.W.2d 671, 675 (1942), and *Winters v. Slover*, 151 Tex. 485, 251 S.W.2d 726, 728 (1952), "a trustee has no power to sell the debtor's property, except such as may be found in the deed of trust; and the powers therein conferred must be strictly followed."

While under the trustee's deed Adams was authorized, and it was his duty, to sell the property and to execute a deed with general warranty of title in fee simple, he was also authorized, and it became his duty, out of the proceeds of the sale to pay all expenses of the trustee; secondly, to pay the lienholder all principal, interest and attorney's fees; and thirdly, pay the balance to the owner Clark. Adams sold the property to Foxworth under the foreclosure sale, paid Foxworth $566.88 owing to Foxworth under its second lien, and paid the balance of $2,988.17 to the Clarks. Canfield claims he is entitled to the funds paid to Bankers Life because he had a quitclaim deed and an assignment from the Clarks, even though at the time the assignment was executed, the Clarks had received and accepted the $2,988.17 as their balance of the proceeds of the sale. Adams and Foxworth maintain that since Canfield stood in the Clarks' shoes, and the Clarks by accepting the $2,988.17 had waived any claim to any other funds, the Clarks under these facts had constructively received the $11,444.95 paid on their behalf to discharge the first lien. Adams and Foxworth further contend that the Clarks, and Canfield as assignee, are estopped to claim the funds paid by Adams to Bankers Life.

Clark testified that he received a letter together with a check for $2,988.17 from Adams and that he, Clark, was surprised to receive it and was satisfied with it because he was no longer liable, and he considered that Adams paid off the first lien for his benefit, and he had no objection to Adams so doing. He further testified that when Canfield came to see him he did not think he had anything of value to sell to Canfield, but that Canfield told him "something was in default on the way that they're handling or selling the house", and Canfield wanted Clark to give him a quitclaim deed to the house for $100.00. In further testimony Clark said at that point he did not think his house was worth anything to him, but Canfield told him Foxworth had done something illegal but did not tell him what it was except that it was peculiar; and that he and his wife signed a quitclaim deed to Canfield and Canfield paid him $100.00. Clark further testified that he considered he had a good deal; that he did not tell Canfield whether he had received any money or how much he had received from Adams, and Canfield did not ask, but Canfield told him that if there was any money coming to him other than what he had received it would go to Canfield.

Clark testified further that Canfield visited him again, asked him if he had received any money from the house, but did not ask Clark to pay it to him; that Canfield asked him to sign another agreement and told Clark that he, Clark, "would not receive any more money after you executed it." Clark further said that if he had known Canfield was trying to make approximately $11,000 out of the transaction he would not have made the conveyance to him. Clark testified that Canfield explained to him that if there was any additional money coming to Clark it would go to Canfield, that is, that if Foxworth owed Clark any more money, Clark was assigning that to Canfield.

From the testimony and conduct it is shown that Clark never objected to the payment to Bankers Life by Adams; that he considered the payment to Bankers Life to have been made on his behalf; that Clark did not consider himself damaged by such payment of the first lien; and that he did not believe he had anything to sell to Canfield because he (Clark) had already received $2,988.17 as his equity. Adams, as Trustee, wrote the Clarks on November 12, 1973, advising them of the foreclosure sale on November 6, 1973, and that the highest

bid was accepted for $15,000.00, and enclosed a check to them for $2,988.17 "which is the balance remaining after paying off the first mortgage holder, Bankers Life and Casualty Company, Chicago, Illinois, in the amount of $11,444.95 and Foxworth-Galbraith Lumber Company's second lein (sic) in the amount of $566.88." Adams then added, "I kindly ask that you please notify me if you have any questions regarding this transaction."

While the Clarks had already executed the quitclaim deed to Canfield before receiving the letter and check from Adams, Canfield never made any demand upon the Clarks for the money.

Our Supreme Court, speaking through Judge Hamilton, said in *Massachusetts Bonding and Insurance Co. v. Orkin Exterminating Co.*, 416 S.W.2d 396, 401 (Tex. 1967):

"Waiver has been frequently defined as an intentional relinquishment of a known right or intentional conduct inconsistent with claiming it. *Texas & P. Ry. Co. v. Wood*, 145 Tex. 534, 199 S.W.2d 652 (1947); *Rolison v. Puckett*, 145 Tex. 366, 198 S.W.2d 74 (1946). In *Equitable Life Assur. Society v. Ellis*, 105 Tex. 526, 147 S.W. 1152 (1912), this Court held that waiver is essentially unilateral in its character; it results as a legal consequence from some act or conduct of the party against whom it operates; no act of the party in whose favor it is made is necessary to complete it. It need not be founded upon a new agreement or be supported by consideration, nor is it essential that it be based upon an estoppel."

■ Canfield's second subpoint contends that there was no evidence to support the submission of the special issues to the jury, and in his third subpoint he says that the issues submitted are neither material nor controlling in that they constitute no recognizable defense in law or in equity. While the use of the word "consented" in issue one would not be our choice, in our opinion there was no error in submitting it. Canfield argues that there can be no consent by Clark to the acts of Adams in disbursing the proceeds of the sale because Clark could not consent to something he had no knowledge of. The issue was designed to ask whether Clark approved of Adams paying the first lien, and the definition of consent by the court was broad enough to include approval. Consent is also defined as a verb "to give assent or approval", and as a noun "compliance in or approval of what is done or proposed by another" and acquiesce is defined "to accept or comply tacitly or passively." Webster's Seventh New Collegiate Dictionary, G. & C. Merriam Co. 1969.

■ We believe issues two and three are evidentiary issues upon which the evidence is undisputed, and there was no reversible error in submitting them.

■ We are of the opinion that the issues raised in the record for determination were waiver and ratification. The questions presented by the evidence were whether Clark intentionally relinquished a known right, or his intentional conduct was inconsistent with claiming it, and, if so, whether Canfield was bound by Clarks' acts.

Ratification and waiver have been used interchangeably many times. "While to relinquish is the gist of 'waiver' and to approve is the gist of 'ratification', to relinquish a known right is to give validity to the prior act and to approve a prior act is to relinquish a known right." *Jordan v. City of Beaumont*, 337 S.W.2d 115, 118 (Tex.Civ. App.-Beaumont 1960, writ ref'd n. r. e.). The word "ratified" has been defined as "the approval by act, word, or conduct with full knowledge of the facts, of the prior act, with the intention of giving validity to such prior acts." *Jamail v. Thomas*, 481 S.W.2d 485, 490 (Tex.Civ.App.-Houston [1st Dist.] 1972, writ ref'd n. r. e.).

We believe it is undisputed in the record that the Clarks by their acts and conduct relinquished a known right by failure to object to the payment of the first lien by Adams, and that they approved of such payment by Adams and thereby ratified Adams' act. In our opinion Clark is estopped from claiming any of the funds Adams paid to Bankers Life; and, therefore,

Canfield, standing in Clark's shoes, is likewise estopped.

The judgment of the trial court is affirmed.